# Richmond.

## HARRIS' ADM'R v. N. & W. R. R. Co.

### January 11th, 1892.

1. RAILROAD COMPANIES—*Orders—Disobedience—Case at bar.*—In action for damages for killing plaintiff's intestate in a collision of trains alleged to have been caused by misleading orders, where defendant demurred to the evidence;

HELD:

>    In view of the general rules and regulations, the orders in question, and all the evidence adduced by the plaintiff, subject to the most rigid application of the rules applicable to demurrers to the evidence, it is plain that the defendant company was guilty of no negligence connected remotely or directly with the death of the plaintiff's intestate, which was due solely to the joint gross negligence, oversight and disobedience of its orders by the conductor and the deceased, who was engine-man on his train.

2. PRACTICE AT LAW—*Waiver.*—Amending declaration, a demurrer to which has been sustained, and going into trial, waive exception to the ruling of the court.

Error to judgment of circuit court of Bedford county, rendered at the September term thereof, 1889, in an action of trespass on the case wherein N. C. Manson, Jr., administrator of R. W. Harris, Jr., deceased, was plaintiff, and the Norfolk & Western Railroad Company was defendant. The object of the suit was to recover damages from the defendant company for the killing of the plaintiff's intestate, the said R. W. Harris, on the 22d day of July, 1888, by so ordering the movement and running of a material train, on which said intestate was then in the employ of the defendant company as engine-man,

as to cause said train to collide with another and opposing train on said company's road, resulting in the instant death of the plaintiff's intestate.

The plaintiff's declaration, as originally drawn, contained two counts. The defendant demurred to the declaration and to each count thereof, and the court sustained the demurrer; whereupon, at the same term, on the motion of the plaintiff, by his attorney, leave was granted him to amend his declaration by filing two new counts, and the said amendment was accordingly made. And to the amended declaration the defendent pleaded the general issue, and upon said plea issue was joined, and there was a trial by jury. The jury having heard all the evidence adduced at the trial, the defendant demurred to the plaintiff's evidence, and in said demurrer the plaintiff joined. The jury returned a verdict for the plaintiff in the following words: "We, the jury, find for the plaintiff, and assess his damages at $5,000, subject to the opinion of the court on the demurrer to the evidence."

On the defendant's demurrer to the plaintiff's evidence the court gave judgment in favor of the defendant. The parties, by their counsel, made an agreed statement in writing of all the evidence adduced at the trial of the cause, which is certified in the record. And the case is here on a writ of error to said judgment of the circuit court.

*T. N. Williams* and *N. C. Manson*, for plaintiff in error.

*Kirkpatrick & Blackford* and *S. Griffin*, for defendant in error.

RICHARDSON, J., delivered the opinion of the court.

The first question to be considered is the insistance on behalf of the plaintiff in error that the circuit court erred in sustaining the defendant's demurrer to the plaintiff's declaration. As was said by Lewis, P., in *Darracott* v. *Chesapeake & Ohio R.*

*R. Co.*, 83 Va. 288, "A sufficient answer, however, to this objection is that by amending the declaration and going to trial on the merits, the right to object to the ruling of the court on the demurrer was waived. This is a well-settled rule, in support of which counsel for the defendant in error refer to the pertinent language of Nelson, C. J., in *Jones* v. *Thompson*, 6 Hill, 621, who said: 'By amending and pleading the general issue, the defendant admitted the correctness of the judgment on the demurrer. Had he intended to rely upon any error in that judgment he should not have amended, but left the issue upon the record. * * Who ever heard of an issue at law upon the record in this court after the party demurring has availed himself of the privilege by joining an issue of fact?' Upon a similar point, in *Clearwater* v. *Meredith*, 1 Wall. 25, the Supreme Court of the United States said: 'When the plaintiff replied *de novo*, after a demurrer was sustained to his original replication, he waived any right he might have had to question the correctness of the decision of the court on the demurrer. In like manner he abandoned his second replication when he availed himself of the leave of the court and filed a third and last one.' And the same rule prevails in equity. *Marshall* v. *Vicksburg*, 15 Wall. 146. No other authority, however, need be cited than the decision of this court in *Hopkins, Brother & Co.* v. *Richardson*, 9 Gratt. 485, which is directly in point and in accordance with the view we have expressed."

We come now to consider the case on the merits. The case turns upon the interpretation to be given to two orders sent by the defendant company's train dispatcher to, and received by Jerome Keith, the conductor, and R. W. Harris, Jr., the engine-man, of the material train which they were running, and on which they were at the time of the collision with another train of said company on its road, when said Harris was killed. The orders in question may be designated as Liberty order, No. 105, and Forest order, No. 114; and they are in the words and figures following:

"Norfolk & Western Railroad Company.
"Telegraphic Train Order, No. 105.
"Superintendent's Office, Roanoke, July 21st, 1888.

"For Liberty Station.   To Conductors and Engine-men of No. 58, Engs. 171—7—173 and 169 and Eng. 42.

"Eng. 42 will carry signals and run as first (1st) No. (58) fifty-eight from Liberty to Lynchburg.

"No. (55) fifty-five, of July (21st) twenty-first, is annulled between Island Yard and Roanoke.   Eng. 42 will carry signals and run as first (1st) No. (57) fifty-seven from Forest to Roanoke; first (1st) and second (2d) No. (57) fifty-seven, Engs. 1 and 172, and first (1st), second (2d) and third (3d) No. (58) fifty-eight, Engs. 42, 171 and 7, will meet at Bellevue; first (1st), second (2d) and third (3d), (No. 58) fifty-eight have right of track to Forest against 3d No. (57) fifty-seven.

"*J. C. C., Superintendent.*"

"Norfolk & Western Railroad Company.
"Telegraphic Train Order, No. 114.
"Superintendent's Office, July 21st, 1888;

"For Forest Station.   To Conductor and Engine-man of 1st and 2d No. 58, Engs. 42 and 7.

"First (1st) and second (2d) No. (58) fifty-eight, Engs. 42 and 7 have right of track to Island Yard against third (3d) (57) fifty-seven.

"*J. C. C., Superintendent.*"

On behalf of the plaintiff it is contended that the Forest order, No. 114, was indefinite and misleading, and lured the deceased to his death.   On the other hand it is claimed by the defendant that said order, in itself, and especially when taken in connection with the previous Liberty order, No. 105, was, in every respect, in strict accordance with the general rules

and regulations of the company, was not open to misconstruction, nor misleading, but was distinct, definite and clear in its terms, and could not mislead except by gross negligence and oversight; and that the deceased came to his death by plainly disobeying the orders in question.

In order to a clear apprehension of the orders in question it will be necessary to here reproduce certain general rules and regulations of the defendant company, which appear in the record:

"West-bound trains will have absolute right of track over trains of the same or inferior class running in the opposite direction, east; and passenger trains must keep entirely out of the way of all west-bound passenger trains. East-bound freight trains must keep entirely out of the way of all passenger trains east bound, and all passenger and freight trains west bound. West-bound freight trains will have absolute right of track over east-bound freight trains, but must keep entirely out of the way of all passenger trains in either direction.

"In case any of the rules should not be clearly understood when out on the road, ask for information by wire.

"An order against a specified train gives no right whatever over any other train.

"No train has a right to run ahead of its schedule time without written orders to do so.

"When trains having right of track do not arrive at meeting and passing points on time, trains not having the right of track, unless otherwise ordered, will wait indefinitely for them.

"When two trains of the same class meet, the train not having the right of track must take the siding.

120. "Conductors and engineers will be held equally responsible for the violation of any of the rules governing the safety of their trains; and they must take every precaution for the protection of their trains, even if not provided for by the rules.

121. "In all cases of doubt and uncertainty, take the safe course and run no risks.

507. "An order to be sent to two or more offices must be transmitted simultaneously to as many as practicable. The several addresses must be in the order of superiority or rights of trains, and each office will take only its proper address. When not sent simultaneously to all, the order must be sent first for the train having the superior right of track.

508. "Operators receiving orders must write them out in manifold, during transmission, and make the requisite number of copies at one writing, or trace others from one of the copies first made.

509. "When an order has been transmitted, preceded by the signal '31,' operators receiving it must (unless otherwise directed) repeat it back at once from the manifold copy, and in the succession in which their several offices have been addressed. Each operator repeating must observe whether the others repeat correctly. After the order has been repeated correctly by the operators required at the time to repeat it, the response, 'O. K.,' authorized by the train dispatcher, will be sent simultaneously to as many as practicable, naming each office. Each operator must write this on the order, with the time, and then reply, 'i. i., O. K.,' with his office signal. Those to whom the order is addressed must then sign their names to the copy of the order, to be retained by the operator, and he will send their signatures to the superintendent. The response, 'complete,' with the superintendent's initials, will then be given when authorized by the train dispatcher. Each operator receiving this response will then write on each copy the word 'complete,' the time, and his last name in full, and will then deliver a copy to each person included in the address, and each must read his copy aloud to the operator.

510. "For an order preceded by the signal '31,' 'complete' must not be given to the order for delivery to a train of inferior right until 'O. K.' has been given to and acknowledged

by the operator, who reserves the order for the train of supe-
rior right. Whenever practicable, the signatures of the con-
ductor and engine-man of the train of superior right must be
taken to the order, and ' complete ' given before the train of
inferior right is allowed to act on it.

" After ' O. K.' has been given and acknowledged, and
before ' complete ' has been given, the order must be treated
as a holding order for the train addressed, but must not be
otherwise acted on until ' complete ' has been given.

" If the line fails before an office has received and acknowl-
edged ' O. K.' to an order preceded by the signal ' 31,' the
order at that office is of no effect, and must be there treated
as if it had not been sent."

Read in the light of these rules and regulations, there can-
not be any serious difficulty in arriving at the true interpreta-
tion of the orders in question, nor in determining whether the
plaintiff's intestate came to his death by reason of the negli-
gence of the defendant company in so framing said orders as
to mislead him, or whether his own gross negligence and dis-
obedience of the orders was the sole cause of his death.

At the time of the accident, and for years prior thereto, the
defendant company was running its trains under the system
of rules and regulations known as the " duplicate system."
This is explained in the testimony of James C. Cassell, a wit-
ness for the defendant, who says: ."I am superintendent of
Lynchburg division of Norfolk and Western railroad, and
have been such since 1st July, 1888; before that I was train-
master of Western division for four years, and was train-master
on Shenandoah Valley railroad before that for four years; before
that had been telegraph operator on Pennsylvania railroad for
six years. I am familiar with the running of trains on various
railroads. I have read orders Nos. 105 and 114; they are in
the usual and proper shape, and according to the rules of the
Norfolk and Western Railroad Company in operation for two
years before this accident. The new rules are in effect what

is called the duplicate or double-order system; the old system was the single-order system; that all orders were sent separately to the trains interested, and under the duplicate system an order is sent to all the trains interested at one and the same time. The duplicate system is the best; under it if the order is carried out there cannot be a collision, for if there is a mistake as to the meeting point, all trains will meet at that point. The order is sent to all the offices interested at one and the same time; each and all receive the same order, and in the same words and figures."

Again, the same witness says: " The system of rules and regulations under which the trains were being run at the time of the accident is called the ' duplicate system,' and was adopted by the Time Convention, composed of train dispatchers representing the railroad companies of the United States, as the best they could devise; it is used by most of the railroads and is growing in favor."

Under this system a train is made up of several sections, each of which is in reality a fully equipped train, but they are denominated sections, and are designated by numbers, and together constitute a train. In this way an indefinite number of trains or sections may run as one train or on one schedule. When trains or sections run under this system, an engine, without cars attached, is treated as a section in the train, and is numbered as above stated. All trains going west have odd numbers, and all going east have even numbers; and west-bound trains have, as a standing rule, the right of track over east-bound trains. This is so provided by the general rules and regulations of the company, and may be illustrated by the actual state of things existing just prior to and at the time of the accident in question. The train going west, and composed of several sections, was train No. 57, an odd number. The train going east, and also composed of several sections, was No. 58, an even number. The different sections composing each of these trains were numbered, respectively, No. 1 of 57,

No. 2 of 57, No, 3 of 57, and No. 1 of 58, No. 2 of 58, No. 3 of 58, and so on. For the purposes of this case, these trains, Nos. 57 and 58, will be considered as having—the first, or No. 57, three sections; and the second, or No. 58, only two sections; that is, until one section was added to each of them, as will presently be explained, and this we do because the orders in question have no bearing upon any greater number of sections.

Again, when a train composed of a number of sections and moving on the same schedule, has another section or engine added to it at any given point, then the numbers of the sections following the added section are changed *at and from the point where the addition is made.* Thus, in the present case, train No. 57, composed of three sections and going west, had engine No. 1, which constituted a section, added to it at Forest, and the section thus added was put in the lead, and became the first section of train No. 57 from Forest west to Roanoke. This in no manner affected the numbers or the running of the several sections of train No. 57 east of Forest, they still retaining east of that point their respective numbers and regulating their movements accordingly. But on reaching Forest, the point of addition, each of them changed its number by one, so that No. 1, east of Forest, became No. 2, west of Forest; No. 2, east of Forest, became No. 3 west of Forest; and No. 3, east of Forest, became No. 4 west of that point. .

Keith, the conductor, and Harris, the engine-man of the material train, which afterwards collided with No. 2 of train 57, east of Forest, were at Liberty on the evening of Saturday, the 21st of July, 1888, and were anxious to get home to their families in Lynchburg. In the petition for writ of error, it is said: " There were Keith and Harris within twelve miles of their homes, anxious to spend Sunday with their families, and under orders from their immediate superior, Captain Stanley, to reach Lynchburg, if possible, Saturday night," &c. On the same subject, Conductor Keith, the only witness intro-

duced by the plaintiff, says: " On July 21st, 1888, I was conductor of material train. Captain Stanley told me Friday evening to get back to Lynchburg Saturday night, if I could. At Blue Ridge asked for orders to Lynchburg of Mr. Reily, train dispatcher, Mr. Given being on duty, I suppose. I had received a letter from Mr. Stanley that the section-master could help me to clear away the foundation for a station at Blue Ridge. I did not receive any orders; don't remember the hour I started from Blue Ridge; two sections of No. 58 had passed me at Blue Ridge. I did not know where they were, and sent flag on mail train to Buford's to hold all trains till I got there. I found the two freight trains on side track at Ironton, between Blue Ridge and Bufords. At Bufords I tried to get orders again; they said they could not do anything for me. I put off flagman at Thaxton, and worked as special between trains down to Liberty. I was not allowed on main track after eight o'clock, and my time having run out at Liberty, I again asked for orders to Lynchburg. After an hour or two I was told he could only run me as first of 58. I put my train on siding, and determined to stay at Liberty. Finally I got orders," referring to the Liberty order, No. 105, above set forth. Now, all this but too plainly shows that the one controlling idea with both Conductor Keith and Engineman Harris was to get to Lynchburg, and that they unfortunately permitted this idea to dominate their thoughts and actions, and to lead them to misinterpret and disobey the plain terms of the orders they had received.

Now what was order No. 105 ? and what information did it impart to Conductor Keith and Engine-man Harris ? Stripped of what, for the purpose of this opinion, is mere repetition and surplusage, the order, which contains three distinct clauses, reads as follows :

Engine 42, will carry signals and run as first 58 from Liberty to Lynchburg.

No. 55, of July 21st, is annulled between Island Yard and Roanoke.

Engine 1, will carry signals and run as first No. 57, from Forest to Roanoke; first and second No. 57, engines 1 and 172, and first, second and third, No. 58, engines 42, 171 and 7, will meet at Bellevue; first, second and third, No. 58, have right of track to Forest against third, No. 57.

Now, keeping in mind that the material train, of which Keith was conductor and Harris was engine-man (and which for convenience will hereinafter be referred to as Keith's train) was designated as No. "42," that being the number of its engine, the effect of the first paragraph of Order No. 105, was to add Keith's train to No. 58, at liberty, and to make it the first or leading section of train No. 58, from Liberty to Lynchburg. This, of course, made it necessary to change the numbers of the following sections of No. 58, at and from Liberty east to Lynchburg, but did not affect the numbers of such sections west of Liberty. .

The second clause of the order (No. 105) simply informs the conductors and engine-men of all trains affected thereby, that No. 55, of the same date (July 21st, 1888) is annulled between Island Yard and Roanoke. It is not explained why this clause was inserted in Order 105, but it was doubtless inserted as a means of securing safety and certainty in the execution of the orders in other respects.

The third clause of Order 105, informs Conductor Keith and Engine-man Harris, and all other conductors and engine-men of No. 58, affected thereby, that a corresponding addition had been made to No. 57, the west-bound train, at Forest, and gave specific directions as to the running of certain designated sections of Nos. 57 and 58, between Liberty and Forest. Hence, the order briefly stated, says: Engine 1 will carry signals and run as section one of train 57, from Forest to Roanoke; that first and second sections of train No. 57, engines 1 and 172, and sections one, two and three of train No. 58, engines 42, 171

and 7, will meet at Bellevue, and that said sections one, two and three of train No. 58, have right of track, not to Lynchburg, but to Forest only, against the third section of train No. 57, meaning necessarily the third section of No. 57, west of Forest, which was then the second section of No. 57, and then east of Forest and retaining its designation of second No. 57, which would not be changed until its arrival at Forest, when it would take its new designation of third section of 57, and run and receive and obey orders as such; and it was against such run, west of Forest, that Order 105 gave the right of track to sections one, two and three of No. 58 to Forest, and to that point only.

Now, the Liberty Order (No. 105) informed Keith and his Engine-man Harris, that an addition had also been made to train No. 57 at Forest, and that the addition thus made was engine 1, and that it would run as section 1 of 57, from Forest to Roanoke. The same order gave the same information to all conductors and engine-men interested. The conductors and enginemen of sections one, two and three of No. 58, had been told to meet sections one and two of No. 57 at Bellevue.

In obedience to orders, Keith's train as well as the second and third sections of 58, which were embraced in the Liberty order, ran safely to Bellevue, arriving there before sections one and two of 57 arrived, and went on the siding. Why did Keith, as well as the others, go on the siding? The order gave no special directions to that end. They did it simply because of their knowledge that, by the general rules of the company, "west bound trains had the absolute right of track over trains of the same or inferior class running in the opposite direction, east;" and because of this knowledge of the further express provision that "when two trains of the same class meet, the train not having the right of track must take the siding." Thus far Keith, in the light of the general rules and regulations of the company, correctly interpreted the special orders under which he was running, and he ran his train successfully.

Finally, the meeting provided for in the Liberty order was effected by the arrival of sections one and two of 57 at Bellevue. What were these two sections? They were engine 1, which had been added to No. 57 at Forest, and was running as the leading section of that train from Forest west to Roanoke, and section No. 2, west of Forest, which had been No. 1 east of Forest. There could be no mistake as to this, for there, at Bellevue, Keith, as well as the conductors and engine-men of the two sections of 58 following, saw and, of course, could count the two trains or sections met at that point. Then the Liberty order concludes by giving the three sections of No. 58 the right of track to Forest against the third section of No. 57. The right of track thus given applies only to that part of the track from Bellevue to Forest, and the third section of 57 referred to, and against which the right of track was given, could only mean *the next following section of 57 from Forest to Bellevue*, which was necessarily the section of 57 then east of Forest and designated as section two of 57, which designation it was bound to retain until it reached Forest, at which point it would take its new designation of No. 3 of 57, and, as such, follow the two preceding sections which had been met and passed at Bellevue. Now, inasmuch as a section had been added to No. 57 at Forest, and was running as the leading section of that train from Forest west, and inasmuch as No. 1 of 57, east of Forest, had arrived at that point, took its new designation of No. 2 of 57, and as such had followed No. 1 of 57 to Bellevue, where the two were met and passed by sections one, two and three of 58, it became necessary to guard against the next following section of 57 from Forest west, which was necessarily No. 3 west of Forest, though then east of Forest and running to that point, but no further, as No. 2 of 57. Hence, as the train or section was west-bound and had the absolute right of track over all east-bound trains of the same grade, it was necessary, by special order, to give to sections one, two and three of No. 58 the right of track to Forest, and the Lib-

erty order so provided, and under the provisions of this order
(No. 105) Keith ran safely to Forest, and there again went on the
siding. Here, again, Keith exemplifies the fact of his famili-
arity with the rules and regulations of the railroad company,
and the further fact, that in recognizing these rules and regu-
lations and obeying the special orders of the company in
accord therewith there is the utmost degree of safety that
human ingenuity and skill can provide.

At Forest Keith, the conductor, and Harris, the engine-man,
of said material train, then constituting section 1 of No. 58,
received order No. 114, known as the Forest order. This
order has been already set out in full. It was addressed to
conductor and engine-man of first and second No. 58. Both
Keith and Harris received a copy of it. Briefly the order is
this : "First and second No. 58, Engs. 42 and 7, have right of
track to Island Yard against third fifty-seven."

On receiving this order Keith's train pulled out from Forest,
ran two miles east and collided with No. 2 of 57, east of Forest,
a train against which the right of track had not been given, and
which was not even mentioned in the Forest order. In order
to a proper interpretation of the last-named order it should be
looked at in connection with the Liberty order, and both
orders should be read and interpreted in the light of the gene-
ral rules and regulations already set forth. So read and con-
strued, can it be said that either of them—especially the Forest
order—was so negligently and carelessly framed as to be mis-
leading, and to have contributed in any—even the least—degree
to cause the death of the plaintiff's intestate ? We think not.
Keith, as before stated, was the only witness introduced by
the plaintiff. In his testimony, on cross-examination, he makes
it clear to the point of actual demonstration that he was per-
fectly familiar with the general rules and regulations of the
railroad company ; that the orders in question were in accord-
ance with said rules and regulations, and that the accident
was the result of the hasty, inconsiderate and gross oversight

of himself and the deceased, and was not due to any negligence or want of care on the part of the defendant company.

In his examination-in-chief, referring to his action under the Forest order, among other things, he says : " The operator gave us a clearance card, which is produced. This card gave me right to leave when our orders allowed; not before. We started out from Forest and met the train going west, which I took for third of 57, and would so take it now, under the same circumstances. As result of the collision Mr. Harris was killed. * * * I took the train with which we collided for third of No. 57. I had passed two sections of 57, as I counted them, at Bellevue. I believe the next section was third of 57," &c.

Now, Keith had been informed by the Liberty order of the addition of engine 1 to No. 57 at Forest, and that it would run as section one of 57 from Forest to Roanoke. He knew that each of the sections of 57, east of Forest, would, in consequence of such addition, necessarily change their numbers by one on reaching Forest. He had been told, in the Liberty order, to meet first and second of 57 at Bellevue, which necessarily meant first and second of 57 west of Forest; and when he met them, as he did, at Bellevue, he was bound to see and know that No. 1 was the engine which had been added at Forest, and that No. 2 was what had been No. 1 of 57 east of Forest. Knowing this, he was also bound to know, if capable of counting them, that the next-following section was No. 2, then east of Forest, because it was the section against which he had been given the right of track to Forest, and that it was then approaching Forest from Lynchburg, and that it would become No. 3 of 57 at Forest, and, as such, would follow the two sections which he had met at Bellevue.

How incredible, then, is Keith's statement, that he *took* the train with which he collided for third of 57, and that he had passed two sections of 57, *as he counted them*, at Bellevue. It is true he had passed two sections of 57 at Bellevue, but he

knew, as already explained, that they were only such west of Forest; that the second of them had been No. 1 east of Forest; that No. 2 east of Forest had not arrived at that point; that it was somewhere on the road between Lynchburg and Forest, and that he did not have the right of track against it. Yet when given the right of track to Island Yard against No. 3 of 57, he starts out from Forest, and in a little while collides with No. 2 of 57, with the disastrous consequences already stated.

On his cross-examination Keith made this statement: "I never blamed myself for this accident; never had any remorse of conscience. If Mr. Givens had put in the Forest order 'Engine 3 will run as second No. 57 from Lynchburg to Forest, and as third 57 from Forest to Roanoke,' there would have been no trouble; Mr. Harris and I would both have understood it."

[Here the witness was handed a map of the road—thus:

Liberty,          Bellevue,          Forest,          Lynchburg,

and handed also blocks, marked and numbered so as to represent all the engines and trains mentioned in the two orders, and was asked to place and move said blocks as the trains and engines named were by these orders directed to move.]

The witness did this by moving Engine No. 1, added to No. 57 at Forest, and the train which had been No. 1 of No. 57 east of Forest to Bellevue, and there these were passed by the three trains (including his as No. 1) of No. 58, and moved these three trains, leaving sections two and three of 57 east of Forest.

The witness then said: "When I received the Forest order, I knew that 57 east of Forest had in it three sections at least, because third of 57 was mentioned in the order. I knew that trains going west had the right of track against east-bound trains, and that when I got to Forest I could not move against

a west-bound train unless I had orders to do so. I had no right of way against second of No. 57 east of Forest. The number of the sections of 57 changed at Forest by Engine No. 1 being added on there; adding on Engine 1 to 57 at Forest did not change the numbers east of Forest." ·

By this exemplification and answer Keith demonstrates two things—first, his knowledge of and familiarity with the rules of the company; and, second, his correct understanding of the clear import of the terms of both the Liberty and the Forest orders. In other words, he shows conclusively that he was possessed of all the knowledge and information necessary to enable him to pursue, with absolute safety, the plainly-marked out path of duty; and yet that he, by some almost-inexplicable oversight, forgot the orders given him at Liberty, and lost sight of the fact that he never had the right of track against No. 2 of 57 east of Forest. Yet he goes on, in his further cross-examination, to say: "I thought I was right at the time, but I would not do it now, after having the matter explained to me." This is a mere assumption unsustained by any evidence. So far from having the matter explained to him, he explained and fully illustrated it in open court. He was handed a rough sketch of the road between Liberty and Lynchburg, and was also handed some blocks, marked and numbered so as to represent all the sections of trains 57 and 58, and asked to *place* and *move* them as required by the Liberty and Forest orders, and he did it with perfect accuracy, leaving No. 2 of 57 east of Forest, the train against which he did not have the right of track, and with which he collided, still east of Forest when he started on his fatal run from that point. How weak and impotent, then, is his pretention that "I *took* it that I had met first and second of 57 at Bellevue, and when my order at Forest gave me the right of way to Lynchburg against No 3 of 57, I thought that, as I had passed first and second of 57 at Bellevue, my way was now clear to go on," &c. This is an incredible attempt to explain away a flagrant blunder, which,

upon the facts admitted by Keith, was wholly inexcusable. He admits that he knew that 57 east of Forest had in it three sections at least, because No. 3 of 57 was mentioned in the Forest order ; yet with the right of way against No. 3 only, he starts out from Forest, and runs into No. 2 east of that point, which he knew had not reached Forest, and that it would at that point become No. 3 west of Forest, just as the preceding section had been No. 1 east of that point, but become No. 2 west thereof.    He admits his knowledge of the fact that trains going west had the right of track against eastbound trains, and that when he got to Forest he could not move against west-bound trains unless he had orders to do so; and yet at Forest he moved against a west-bound train without orders to do so.    He admits that he had no right of way against No. 2 of 57 east of Forest, yet he took the track at Forest, and run into that very train.    He admits knowledge of the fact that the sections of 57 changed numbers at Forest by reason of the addition of Engine 1 at that point, and he, therefore, necessarily knew that only No. 1 of 57 east of Forest had passed that point, and become No. 2 of 57 at and from that point west, and that was the No. 2 of 57 which, with Engine 1, he had met at Bellevue; and yet he undertakes to say, and in effect does say, that he *took* the No. 2 of 57 which he met at Bellevue to be the same No. 2 which he collided with east of Forest.    The attempted explanation is absurdly weak and incredible.

And Keith attempts to bolster up this evident afterthought by saying : " If Mr. Givens (the train dispatcher) had put in Forest order ' Engine 3 will run as second No. 57 from Lynchburg to Forest, and as third 57 from Forest to Roanoke,' there would have been no trouble; Mr. Harris and I would both have understood it."    That is precisely what the Liberty order did say, though in a different but more concise and comprehensive form.    It informed him of the addition of Engine 1 at Forest, which Keith admits informed him that the numbers

of 57 east of Forest changed at Forest. But he seeks to excuse his blunder upon the ground that the number of the engine drawing the train collided with should have been given in the Forest order.

If this be a valid objection to the Forest order (No. 114), it applies equally to the Liberty order (No. 105), which Keith correctly interpreted and ran with safety from Liberty to Forest. The Liberty order notified Keith as to No. 3 of 57, west of Forest, in these words and figures: "First, second and third No. 58 have right of track to Forest against third No. 57." There is no other mention of third 57, west of Forest, in either of the orders. The object of the Liberty order was to advance the three sections named of No. 58 from Liberty to Forest, and only to that point. But to do this with safety it became necessary to notify the conductors and enginemen of these three sections that they would meet Nos. 1 and 2 of 57 at Bellevue—that is, they would meet No. 1, which was added at Forest, and No. 2 west of Forest, which had been No. 1 east of Forest. And as No. 2 of 57 east of Forest had the right of track, and, in the absence of orders to the contrary, would, on its arrival at Forest, change its number to third 57 west of that point, and as such follow the two sections which had been met and passed at Bellevue, it became necessary to give to the three sections of No. 58 the right of track against No. 3 of 57 west of Forest. In other words, the Liberty order, in this respect, said and clearly said, in effect, that No. 2 of 57, east of Forest, will not be permitted to run as No. 3 west of Forest until first, second and third of 58, which are given the right of track to Forest, have reached that point. Now, the orders received by Keith at Liberty, as affecting his rights and duty, applied only to the track between that point and Forest. When he reached Forest, as he did in safety, his rights under the Liberty order were exhausted, and he could not rightfully move without further orders, and then only as specifically directed. Hence, the Forest order referred to a

different part of the company's track—that from Forest to Lynchburg—and in order to act under it with perfect safety, it was only necessary for Keith to remember what he had been told in the Liberty order. He omitted to do this, and as a consequence misinterpreted his orders, which in themselves were faultless, and the result was the destruction of human life as well as the property of his employers.

But Keith's failure to wait at Forest until the arrival of No. 2 of 57, east of that point, was in no way due to the absence in the order of the number of the engine of that section. Keith himself gave the true explanation immediately after the disaster, and when the appalling truth confronted him. Just after the accident, Captain Douglass, the conductor of one of the three sections of No. 58, met Keith and asked him to let him see his orders, and Douglass testifies that after he read them over, Keith said to him : " Harry, this puts me in for it," and that " he had read the order and overlooked Engine No. 1 turning back from Forest."

Captain Watson, the conductor of No. 2 of 57, with which Keith's train collided, testified that he heard a conversation after the accident between his engine-man, Pat. Donovan, and Captain Keith, in which Donovan asked Keith to let him see his orders ; and that Keith said : " No, it was not necessary ; it would just wear them out; that, *by Neds ! we overlooked the engine that turned back from Forest.*" Keith does not deny this positive testimony of Douglass and Watson. He only says : " I met Captain Douglass, and don't remember what passed between me and him ; can't say what was said ; don't remember I told him I was in for it ; don't remember that I told him or anyone that I had made a mistake, as I was very much excited at the time, and don't remember what passed between me and anyone else. I don't remember telling Watson that I had forgotten that Engine 1 was turned back at Forest and added to 57."

In the face of these unbending facts it is worse than vain

and idle to claim that the omission of the number of the engine betrayed Keith into error.

Great stress is put upon the statement of James C. Cassell, on his cross-examination, that "if the order had said that second of 57 east of Forest would run as third of 57 west of Forest, the accident probably would not have occurred." This, however, is not by any means all that Cassell says. He adds : "But this was not at all necessary, as it would have been only an explanation of the order which had already informed him (Keith) that Engine 1 was turned back from Forest and became No. 1 of 57 from Forest; this making No. 1 east of Forest to become No. 2 *east* (evidently meaning No. 2 west); No. 2 east of Forest, No. 3 west of Forest, and so on. Having passed No. 2 of 57 west of Forest, he regarded that the track was open to him against No. 3 east of Forest. He lost sight of the train or engine that was added at and west of Forest. Mr. Givens was the train dispatcher on duty at the time of the accident; he is not with the company now; he remained with the company several months after; don't remember how long though. He had tendered his resignation a month before the accident, and remained with us until his place could be supplied; his resignation was not asked by the company, and it would be glad to get him back. The duplicate system tells all trains interested what each is to do; informs each of the movements of all; the number of engine was not necessary in these orders to avoid the accident, nor do orders by telegraph to trains repeat the orders growing out of the rules and regulations and the schedules of train; they are sent only where the rules, regulations and schedules do not give the desired information; Nos. 57 and 58 are schedule trains."

The testimony of Cassell, taken all together, cannot be misunderstood, nor does it need the support of argument to enforce its consistency, reasonableness and truth. But suppose it could be said that it was necessary to give the number of the engine, or to have said "Engine 3 will run as second No. 57 from

Lynchburg to Forest, or as third 57 from Forest to Roanoke," might it not, with equal propriety, be said that each special order should repeat all the general rules and regulations of the company, which are in themselves standing orders, and special orders are used only to supplement them as exigences arise requiring them? But is it not absurd to say that the omission of the number of the engine was misleading, and that the omission lured the plaintiff's intestate to his death? We think so. Upon what conceivable ground can it be said that an experienced conductor or engine-man would fail to see a whole train, engine and all, and yet would observe and remember the number of the engine attached to the same train?

It is useless to pursue the subject further. The rules and regulations of the defendant company seem to be the best that human skill has been able to devise; and, in the light of these rules and regulations, the orders in question are faultless. In view of the general rules and regulations the orders in question, and all the evidence adduced by the plaintiff, subject to the most rigid application of the principles applicable to a demurrer to evidence, two things are made too plain to admit of doubt.

First. That the defendant company was guilty of no negligence whatever connected either remotely or directly with the death of plaintiff's intestate, but that it was due solely to the gross negligence, oversight and disobedience of their orders by Keith, the conductor, and the deceased, who was the engineer on Keith's train.

Second. That the circuit court of Bedford county did not err in sustaining the defendant's demurrer to the plaintiff's evidence and in giving judgment accordingly for the defendant.

It follows that no questions as to contributory negligence arise in the case. It is a plain case of death resulting from the negligence of the deceased, who was the co-equal co-employee

of Keith, the conductor of the train on which he was engine-man, there having been no negligence on the part of the train-dispatcher, the agent and representative of the company, in transmitting the orders in question. And it necessarily follows that the question of fellow-servants does not arise in the case, as the orders were addressed to both Keith and Harris. Each of them received, and each receipted for, the orders, and had copies in his possession; and the latter went to his death with a copy of the company's general rules and regulations, and a copy of those special orders, on his person. They were each equally in fault in causing the collision, which was the result of their joint disobedience of orders.

In conclusion, it may be well to notice briefly another strangely inconsistent contention on the part of counsel for the plaintiff in error. Having introduced no other witness but Conductor Keith for the plaintiff, and having relied upon his testimony to establish negligence on the part of the company, the plaintiff turns around and insists that the defendant company is responsible for the death of Harris, because Keith, the conductor, was incompetent to discharge his duties, and the company knew the fact. The grounds on which this contention is made are: First. That his incompetency is evident from the fact that he misunderstood the orders given him; Second. That the operator at Forest told Keith to pull out as soon as second of 57 passed—information which was not given to Harris, and which Keith disregarded; Third. That Keith had theretofore come very near having a collision which was due to his fault.

Surely it cannot be necessary to adduce arguments to meet and answer a contention so manifestly without merit. In conclusion, it is only necessary to say that the deplorable accident was due, not to Keith's incompetency, but to gross oversight on the part of both Keith and Harris, amounting to a palpable disobedience of orders. And it is evident that their gross oversight was the result of their eagerness to get to Lynch-

burg and be with their families over Sunday—a worthy desire, but one that should have been subordinated to the mighty interests at stake and dependent upon their watchful fidelity in running their train.    In addition to what has already been said, this is made more manifest by Keith's own testimony. He says: " As soon as we got the clearance card, Harris and I *ran down* to our train on the siding," &c.    This intemperate haste led to the destruction of both life and property.

For the reasons aforesaid we are of opinion that the judgment of the circuit court of Bedford is clearly right and the same must be affirmed.

JUDGMENT AFFIRMED.